Mary C. MENDONSA et al.

v.

Robert COREY et al.

85–56–M.P.

Supreme Court of Rhode Island.

July 5, 1985.

Robert Silva, Middletown, for plaintiff.

B. Mitchell Simpson (Callahan & Sayer), Newport, for Robert Corey.

Kathleen Managhan (Corcoran Peckham & Hayes), Newport, for Jerome Kirby.

Kenneth R. Tremblay (Tremblay & Gorton), Portsmouth, for Alfred Pedro.

OPINION

SHEA, Justice.

This petition for certiorari was brought to review a judgment of the Superior Court reversing a decision of the Zoning Board of Review of the Town of Middletown (the board). The board had denied a special exception to permit the construction of a fifty-one unit multifamily housing complex. We granted the petition and issued the writ on March 14, 1985.

The record reveals the following pertinent facts. Mary C. Mendonsa and Joseph F. Medeiros are the owners of approximately nine acres of unimproved land located on the westerly side of Aquidneck Avenue in Middletown. Fieldstone Properties, a limited partnership, is the holder of an option to purchase that property. Mendonsa, Medeiros, and Fieldstone Properties will hereinafter be referred to as the applicants/respondents. The petitioners, Jerome R. Kirby, Jr., Helen C. Kirby, Winifred C. Kirby, Alfred Pedro, and Christa Pedro, are abutting property owners. The applicants' land, as well as that of petitioners, is located in an R–20A, medium-density residential zone under the Middletown zoning ordinance.

As part of their plan to erect a fifty-one-unit condominium complex on their land, applicants filed a "Petition for Exception" requesting that they be granted an exception under article IV, section 26, of the zoning ordinance, which petition reads in part:

"Pursuant to the provisions of Section 26–52.1 of said Zoning Ordinance to permit the construction of fifty-one (51) units of multi-family housing.

"Your Petitioners hereby allege that such use shall be 1) compatible with neighboring land uses; 2) not create a nuisance or hazard in the surrounding neighborhood area; and 3) be compatible

with the comprehensive plan of the Town of Middletown."

Under art. IV, sec. 26–16, apartments are allowed as a special exception in medium-density residential areas subject to the regulations set forth in § 26–52.1 of the zoning ordinance. Pertinent provisions of § 26–52.1 provide that

"[t]he zoning board shall act upon proposed development in accordance with the provisions of section 26–64. No proposed development shall be approved by the board unless it is presently served by town water and town sewer and that the water line(s) and sewer line(s) to which it shall be connected have adequate capacity to serve the project or to carry the additional effluent created by the development. Should the line(s) be determined to be inadequate only such portion of the development as can be accepted by the sewer line(s) shall be approved for development provided it meets all other requirements of this chapter."

The board held seven public hearings beginning on November 9, 1982, during which testimony was elicited for and against the application. At the conclusion of the hearings, the board voted two to three to deny the special exception and rendered a written decision on September 2, 1983.[1] The decision contains the following findings of fact and reasons for the action taken by the board:

"A.  That the use in its proposed location will not be compatible with neighboring land uses in that the immediate neighborhood is predominately singly [sic] family homes with large areas of grass and trees. The proposed development will be very dense with little room between townhouses and no garages. Said proposed development will tend to dominate the neighborhood.

"B.  That the use in its proposed location will create a nuisance and a

1. Two of the five members of the zoning board voted against the application, denying applicants the four affirmative votes needed pursuant to G.L.1956 (1980 Reenactment) § 45–24–19 for grant of a special exception.

hazard in the neighborhood. The proposed use will be hazardous to traffic along Aquidneck Avenue. The site is in a water shed area, and the proposed use would present a hazard to the public drinking water supply. Proposed retention ponds would be hazardous and create an attractive nuisance for children.

"C.  That the use in its proposed location will not be compatible with the comprehensive community plan of the Town of Middletown.

"D.  That the use in its proposed location does not promote the public health, safety, comfort, convenience and general welfare. The proposed development will have an adverse and negative effect on the sewer system of Middletown and Newport. The proposed use and its location on the site will have a detrimental effect upon public health, safety, welfare and morals."

Thereafter, applicants appealed to the Newport County Superior Court pursuant to G.L.1956 (1980 Reenactment) § 45–24–20, challenging the "findings, inferences, conclusions or decisions" of the zoning board.

The trial justice evaluated the evidence and held that applicants had sustained their burden of showing that "the proposed use and its location on the particular site would not have a detrimental effect upon the public health, safety, welfare and morals." He further held that there was "substantial evidence to show that this project was compatible with neighboring land uses." He concluded that the testimony offered by the remonstrants either impermissibly "stated conclusions of fact, not facts," or was offered "with no foundation or basis at all." Accordingly, the trial justice sustained petitioners' appeal and reversed the decision of the board. Judgment was entered on January 2, 1985.

The petitioners have briefed and argued one principal issue: that the Superior Court ignored substantial evidence in support of the board's decision and substituted its own judgment for that of the board in determining whether respondents were entitled to a special exception. After reviewing the entire record, we have come to the conclusion that this case is controlled by the rules set forth in *Apostolou v. Genovesi*, 120 R.I. 501, 388 A.2d 821 (1978), and followed in all cases after *Apostolou*.

In *Apostolou, supra*, we analyzed the case law and the legislative directives governing a Superior Court's extent of review in zoning cases under § 45–24–20 prior to and subsequent to its amendment in 1969, which altered the prior appellate review procedure. We concluded in *Apostolou*, that

"§ 45–24–20(5) has altered the scope of review previously established by decisional law in that it requires not 'some' or 'any' evidence but 'substantial' evidence on the whole record to support the board's findings." 120 R.I. at 509, 388 A.2d at 825.

■ That is, a petitioner must show that "substantial evidence" exists on the "whole record" to support the board's findings. Moreover,

"[t]he reviewing court is not empowered to substitute its judgment for that of the zoning board if it can conscientiously find that the board's decision was supported by substantial evidence in the whole record." *Id.*

■ On petition for certiorari to this court, "we apply the 'some' or 'any' evidence test and review the record to determine whether legally competent evidence exists to support the findings of the court below." *Toohey v. Kilday*, — R.I. —, —, 415 A.2d 732, 735 (1980).

■ Having these rules in mind, we have examined the entire record in this case and have found several instances in which the trial justice appears to have substituted his judgment for that of the zoning board.

There was conflicting testimony from experts on both sides in regard to whether the proposed development would be incompatible with the surrounding land use or would be well suited to meet the planning goals and policies established for the neighboring area. For example, Paul J. Hogan, a real estate expert, testified that the proposed development, which would have a lot coverage for the buildings of 12 percent and a density of 5.2 units per acre, would be compatible with neighboring land uses, would not create a nuisance, and was compatible with the comprehensive community plan of the town of Middletown. He categorized the neighboring land uses as primarily one- and two-family residential units plus industrial use in the nearby Aquidneck Industrial Park and secondarily commercial hotels and motels, the Newport County YMCA, an elementary school, and a nursing home and concluded that the development would be compatible with both uses.

Papken Janjigian, Director of the Department of Water of the City of Newport, testified that applicants' proposal for the construction of water mains leading to and throughout the development was acceptable, subject to the inclusion of a twelve-inch main leading up to the site and an eight-inch gate valve midway in the development itself. He testified that there was adequate water supply for the development and that the system as designed was sufficient to provide adequate water pressure for fire protection.

Timothy J. Brown and Walter Hundley, civil engineers who had participated in the design, construction, operation, and maintenance of Middletown's sewer system, testified that the water and sewer lines to which the development was to be connected had adequate capacity to serve the project and to carry any additional effluent resulting from the development. Hundley testified that the capacity of the Middletown sewer system at the Wave Avenue pumping station was designed to handle 6.9 million gallons per day and that the anticipated flow of effluent from the development represented approximately 1 percent of the total flow capacity of the system. He concluded that the Middletown sewer system and the Wave Avenue pumping station were of sufficient capacity to be capable of transmitting the sewage to the Newport system for treatment.

Dennis M. Taber, a member of the State Traffic Commission, testified that the proposed development would not create a traffic hazard in the neighborhood, would have no adverse impact on existing traffic flow, and would not add to or create any traffic congestion in the area, concluding that applicants' plans were acceptable on the basis of public-safety considerations.

Donald F. Geisser, a civil engineer, testified that applicants' plans provided for control of all surface-water drainage through the construction of a self-contained stormwater drainage system that included two equalization areas (retention ponds). He calculated that the rate of surface water runoff from the subject site would not increase during construction or after completion of the development and that the proposed drainage and sewer plans met the requirements of the ordinance, subject to certain agreed-to improvements for erosion and sedimentation controls.

The petitioners presented conflicting testimony on these points. Arthur Nelson, Jr., a qualified real estate expert, expressed a different opinion about the effect that the proposed development would have on the neighboring land uses. It was his opinion, based on his experience in bank appraisals, that although the developers had complied with the requirements of § 26–52.1 of the Middletown ordinance, the construction of fifty-one townhouse units on somewhat less than ten acres would effectively triple the residential population and that the increased use or density within the neighborhood would diminish the value of neighboring single-family homes.

Carleton E. Boardman, a sanitary engineer, testified on the issues of water runoff and the impact that the proposed development would have on the town's sewer sys-

tem. He stated that on three occasions in rainy weather he had observed and photographed overflows from the Wave Avenue pumping station flowing into a small creek and then to the adjacent Easton's Beach area. He testified that "the overflow was active, wastewater was coming out of the overflow, highly torpid [sic] water, the presence of fecal matter, toilet tissue, et cetera, to indicate the presence of sewerage." On these occasions, Boardman testified, he examined the flow charts taken from the Wave Avenue pumping station flow meter and found the pumping station to be pumping at a rate of approximately 2.5 million gallons a day. Relying on his observations of the overflow, he concluded that when the weather was rainy, the pumping station was not capable of achieving its designed capacity. He summarized that "during periods of wet weather the pumping station is not capable of handling the flow that it receives from the Middletown sewer system, and does, indeed, overflow to eventually the Atlantic Ocean." It was his opinion, therefore, that the project would have an adverse effect on the sewer systems of Middletown and Newport. Boardman's observations were corroborated by lay witness, William M. Burns, Jr., a Middletown resident who had witnessed the overflow.

Boardman also testified regarding drainage and stated that in his opinion, applicants' proposed retention pond No. 1 (or equalization area No. 1) would overflow and not function as designed in periods of rainfall. He demonstrated his calculations on a rainfall hydrograph that was placed in evidence describing flow versus time. Based on his method of determining the capacity of the retention pond (which differed from that of applicants' engineer), his conclusion was that the basin would overflow into the adjacent industrial park and down the interior road proposed in the condominium plan. On cross-examination Boardman testified that by increasing the size of the pipe, the overflow of retention pond No. 1 could be cured. Boardman was unable, however, to offer any opinion on whether this curative measure would allow for increased water retention in applicants' proposed retention pond No. 2.

Douglas Cotten, a specialist in water resources management, testified that the proposed development represented a "severe threat to the water quality in the area." He testified that the project would have a negative effect on the quality of drinking water because it was located in what is known as the Bailey Watershed, an area critical to the reservoir supplying the Newport area. It was his opinion that soil-conservation measures would help but not eliminate the adverse situation.

In reviewing the record, the trial justice labeled as conclusionary rather than factual the testimony of Carleton E. Boardman, Jr., the sanitary engineer appearing on behalf of petitioners, whose opinion it was that the Wave Avenue pumping station was not capable of handling the flow from the Middletown sewer system in periods of wet weather. In his bench decision the trial justice stated:

"And there were also witnesses who stated conclusions not substantiated by any facts whatsoever on the question regarding the pumping station which creates a hazard, that is, the sewage and effluence [sic] from the pumping station—that one of the individuals stood outside, and was an engineer, and saw and observed on three particular dates what had occurred, but never checked to make a determination, never checked to determine whether the pumps were in working order or whether there was a breakdown of the plant itself, made a determination on plain observance without the expertise of determining whether the capacity of the pumping station was sufficient to take those matters, that sewage, from the Town of Middletown that would create an additional amount of sewage, and what the additional amount was is not stated, and what the capacity was was not stated. *On the other hand, I believe it was Mr. Boardman who gave testimony regarding the capacity, and there*

*was a contract between the Town of Middletown and the City of Newport regarding the use of this pumping station. And so once again there was a conclusion, based upon fact."* (Emphasis added.)

This portion of the trial justice's opinion, particularly that italicized, creates a question in our minds concerning whether he was referring to the testimony of lay witness William M. Burns, Jr., who testified that he had observed the overflow from the pumping station;[2] of Carleton E. Boardman, who clearly possessed the requisite expertise to determine whether the capacity of the pumping station was sufficient; or of Walter Hundley, who testified for respondents about the designed capacity of the Middletown sewer system.

 On the issue of compatibility with neighboring uses, the trial justice characterized the testimony of petitioners' expert, Arthur A. Nelson, Jr., as "a bold statement * * * with no foundation or basis at all." That witness had stated that the project would adversely affect the property values of neighboring single-family homes and would be generally incompatible with the surrounding area. Nelson was a qualified real estate expert, and as such, his testimony was probative on the issue of the effect a proposed use would have on neighboring property values. *See Toohey v. Kilday,* —— R.I. at ——, 415 A.2d at 737.

On the issues of water runoff and the effect on the quality of the drinking water, the trial justice's finding that there was "absolutely nothing to substantiate that the drinking water will be affected" overlooks the testimony of Douglas Cotten, a specialist in water-resources management, that the project represented a severe threat to local water quality because of its proposed location in a watershed area. Considerations of public health and welfare are relevant to a zoning authority's decision to grant or deny a special exception.

*See Nani v. Zoning Board of Review of Smithfield,* 104 R.I. 150, 156, 242 A.2d 403, 406 (1968). To that end a reviewing court should exercise restraint in substituting its judgment for the judgment of the zoning board which is based on the evidence before it.

In situations like the present case where there is conflicting testimony from equally qualified experts and substantial evidence exists on both sides of the controversy, we believe that the better rule is to limit the extent of judicial review. In such circumstances, we believe that the board, who had before it the individual witnesses and had the opportunity to judge their credibility, was in a better position than the court to resolve the conflict. In our opinion this conclusion is consistent with the language of § 45–24–20 prohibiting the weighing of evidence on questions of fact.

In this case it cannot be said after a review of the conflicting evidence that the board's findings were clearly erroneous. Rather, the board chose to rely on the substantial evidence presented that the proposed development would not be compatible with neighboring land uses and would not promote the public health, safety, comfort, and convenience and the general welfare. The reviewing court should not substitute its judgment under such circumstances.

For the reasons stated, the petition for certiorari is granted, the judgment of the Superior Court is quashed, and the record certified to this court is ordered returned to the Superior Court with our decision endorsed thereon.

---

**2.** If that be the case, the trial justice was correct in discounting the testimony of a lay person who did not possess the requisite expertise. *See*

*Toohey v. Kilday,* —— R.I. ——, ——, 415 A.2d 732, 737 (1980).