DECISION
Appellants James Benincasa ("Benincasa") and John and Laura Humphrey et al. ("Humphrey" or collectively "Objectors") both appeal the February 2, 2010 Decision of the Rhode Island Coastal Resources Management Council ("CRMC" or "Council"), approving and modifying the application of Benincasa to construct a residential dock at his property in Portsmouth, Rhode Island. Jurisdiction in the instant matter is pursuant to R.I. Gen Law 1956 § 42-35-15. *Page 2 
 I Facts and Travel
Plaintiff Benincasa filed an application with the CRMC to construct a residential boating facility. The proposed boating facility is in Type 2 Low-Intensity Use Waters in Portsmouth. Specifically, the proposed project included the construction of a 4' x 90' fixed timber pier, a 3' x 21' ramp and three (3) 5' x 30' floats. The terminus of the proposed pier was to extend 95.6 feet beyond Mean Low Water ("MLW"). Benincasa sought a 45.6 foot variance from Coastal Resources Management Program ("CRMP"). Section 300.4.E.3(1). Section 300.4.E.3 (1) of the CRMP requires that boating facilities shall not extend beyond that point which is fifty (50) feet seaward of MLW.
In September of 2007, Benincasa filed his initial dock application with the CRMC. (R. 14.) In response to comments made by the CRMC on the application, Benincasa's engineer, Todd Chaplin ("Chaplin"), revised the dock design and provided a written narrative demonstrating that the proposed dock met the criteria included in Section 120 of the CRMP. (R. 15.) Based on further correspondence with CRMC staff, Benincasa later filed another set of revised site plans in a January 29, 2008 letter delivered from Chaplin. (R. 17-21.) The CRMC then put this revised application out for a 30 day public comment period, which closed on May 5, 2008. (R. 29.) CRMC staff prepared staff reports, which were provided to the CRMC members for use in their decision making at the hearing. (R. 9-13.) In a report dated August 13, 2008, CRMC staff engineer Mike Deveau, noted that he had no engineering objections to the dock. (R. 12-13.) Similarly, in her September 18, 2008 report, CRMC staff biologist Amy Silva stated she had no biological objections to the approval of the application. A Decision Worksheet was *Page 3 
signed and approved by the CRMC's Executive Director, which memorialized that the CRMC staff had no objection to the application. (R. 9.)
On January 13, 2009, the CRMC held the first of a series of hearings. At this initial hearing, several CRMC members expressed concerns regarding the fetch[1] located at Benincasa's proposed build site, and noted that it would be a difficult location to build a dock. (R. 78-79). Furthermore, the members noted that there were no other docks located in the vicinity of Benincasa's site, and that the three (3) 5' x 30' float design would create a hazardous condition for use of the dock. See id CRMC members also expressed concern regarding the design of the pilings. (R. 79.) During the hearing, the CRMC also heard John Humphrey's objection to the application. Humphrey contended that because of the adverse impacts to lateral access, navigation, fetch, and aesthetics, the application should be denied. After considering these factors, the CRMC voted to deny the application on a 6-2 vote.
Before the CRMC could issue a written decision, Benincasa again modified his application in response to concerns voiced by the CRMC members during the hearing. In this new application, Benincasa modified the three (3) floats and pilings. Benincasa then filed a motion to reconsider with the CRMC. Benincasa's motion was based on the representation that he would modify his application in order to address the concerns raised by the CRMC members during the hearing. (R. 40.) On April 7, 2009, the CRMC approved Benincasa's motion to reconsider. Benincasa then submitted his revised plans on or about May 28, 2009. The revised design eliminated the single row of three (3) floats and instead proposed an "L" shaped float at the end of the dock. (R. 34-39.) Despite the new design, Benincasa maintained his request for a 45.6 foot variance for his dock. *Page 4 
The CRMC staff did not issue a standard report of recommendation to the CRMC Council based on a review of Benincasa's modified proposal. However, on June 3, 2009, Mr. Kenneth Anderson, CRMC Permit Staff, drafted a brief memorandum to the CRMC Council explaining the changes proposed for reconsideration, and noted that the original recommendation of the staff remained unchanged. (R. 34.)
CRMC issued a public meeting notice dated May 19, 2009 that set Benincasa's modified application down for a hearing on June 10, 2009. (R. 133.) The notice was mailed to interested parties, including John Humphrey, Douglas Bernon, and Rose Aidinoff (R. 132.) Prior to the scheduled CRMC hearing to reconsider Benincasa's modified application, Objector Mike Fahey filed an objection with the CRMC on June 5, 2009. Additionally, Objectors Andrew DaSilva, Paul Loscocco, Robert Bartlett, Jr., Martin Duffy, Sue Ann Nealon, Joe Jacques, and Cheryl Chernack also filed objections with the CRMC on June 8, 2009. Objector William Duerr filed an objection with the CRMC on June 9, 2009. (R. 146.) Rose AidInoff also objected. However, her handwritten note was not received by the CRMC until February 8, 2010. (R. 152.) These Objectors are all residents or summer residents of Portsmouth, Rhode Island.
On June 10, 2009 the CRMC held a public hearing to consider Benincasa's revised application. Benincasa appeared at this hearing with his legal counsel and engineer. Additionally, Objectors John and Laura Humphrey, Rose Aidinoff, Ken and Cheryl Chernack, Mike Fahey, and Joe Jacque all appeared represented by legal counsel. Further details of this hearing will be discussed in the sections that follow.
The CRMC issued its Decision (the "Decision") on February 2, 2010. The Decision included nineteen (19) findings of fact. In its Decision, the Council modified Benincasa's proposal, allowing a facility that would extend 55 feet beyond MLW, thereby granting Benincasa *Page 5 
a 5 foot variance, rather than the original 45.6 foot variance requested. The Council also modified the proposal to raise the structure to 6 feet in height to allow meaningful lateral access below it. Finally, the Council required the applicant to construct the dock to more stringent engineering standards to withstand the hazardous sea conditions present at the build site. The Council then approved the application as modified. (R. 6.)
In March, 2010, Objectors and Benincasa both filed individual appeals pursuant to § 42-35-15. On April 1, 2009 this Court granted Objector's motion to consolidate these appeals. The CRMC, Objectors, and Benincasa have all filed memoranda of law with this Court.
 II Standard of Review
This Court "sits as an appellate court with a limited scope of review" when reviewing the decisions of an administrative agency such as the CRMC. Mine Safety Appliance Co. v. Berry,620 A.2d 1255, 1259 (R.I. 1993). Appellate review of agency actions is governed by the Rhode Island APA, § 42-35-1, et seq. Islein v.Retirement Bd. Of Employees' Retirement System of Rhode Island,943 A.2d 1045, 1048 (R.I. 2008) (citing Rossi v. Employees'Retirement System of Rhode Island,895 A.2d 106, 109 (R.I. 2006)). The applicable standard of review codified at § 42-35-15(g) provides:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inference, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or *Page 6 
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"In essence, if "competent evidence exists in the record, the Superior Court is required to uphold the agency's conclusions."Auto Body Association of Rhode Island v. State of Rhode IslandDepartment of Business Regulation et al.,996 A.2d 91, 95 (R.I. 2010). Accordingly, this Court defers to the administrative agency's factual determinations provided that they are supported by legally competent evidence. Arnold v. RhodeIsland Department of Labor and Training Board of Review,822 A.2d 164, 167 (R.I. 2003). Additionally, when examining the certified record, this Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Interstate Navigation Co. v. Dis. Of Pub.Utils. Carriers of R.I., 8724 A.2d 1282, 1286 (R.I. 2003) (citations omitted).
Accordingly, this Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Baker v. Dept. ofEmployment Training Bd. Of Review, 637 A.2d 360, 363 (quotingMilardo v. Coastal Res. Mgmt. Council,434 A.2d 266, 272 (R.I. 1981)). However, because most agencies are presumed to have knowledge and expertise in their respective fields, they have wide discretion in determining the weight or probative value to be given the testimony of the expert witness. Stein,Administrative Law § 28.03. The Court also reviews an agency decision to determine whether it was "otherwise occasioned by error of law." Tierney v. Department of Human Serv.,793 A.2d 201, 213 (R.I. 2002). With regards to questions of law, the administrative agency's decision is not binding on the Court, whose review is de novo. Narragansett Wire Co. v. Norber,118 R.I. 596, 376 A.2d 1, 6 (1977). However, in statutes that the legislature has empowered an administrative agency to enforce, the agency's "interpretation of the statute as applied to a particularly factual situation" should be accorded "weight and deference as long as that *Page 7 
construction is not clearly erroneous or unauthorized." LaborReady Northeast, Inc. v. McConaghy, 849 A.2d 340, 344 (R.I. 2004) (quoting In re Lallo, 768 A.2d 921 (R.I. 2001)). This deference is owed even when there are differing interpretations that could reasonably be applied to the statute. Id.
 III CRMC's Statutory Scheme and AdministrativeRegulations
The CRMC's authority emanates in part from the public trust doctrine. The public trust doctrine dictates that "the state holds title to all land below the high water mark in a proprietary capacity for the benefit of the public." Greater ProvidenceChamber of Commerce v. State, 657 A.2d 1038, 1041 (R.I. 1999). The state's authority over that land is limited by the Rhode Island Constitution, art. I, § 17 which provides that the people shall continue to enjoy "the privileges of the shore," which includes the right to fish, swim, and pass along the shore. SeeJackvony v. Powel,67 R.I. 218 227-28, 21 A.2d 554, 558 (1941). Within these constitutional limits, the state possesses broad power over tidal land.
Pursuant to this broad authority, it is the policy of the State of Rhode Island to "preserve, protect, develop and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long-range planning and management designed to produce the maximum benefit for society from such coastal resources. . . ." G.L. 1956 § 46-23-1. To further these ends, the General Assembly established the Coastal Resources Management Council and imbued it with the responsibility of "planning for and management of the resources of the state's coastal region." Sec. 46-23-6(1). Additionally, the CMRC has been granted the power to `approve, modify, set conditions for, or reject' any proposed "development or operation within, above or beneath the tidal water . . ." Townof *Page 8 Warren v. Thorton-Whitehouse, 740 A.2d 1255, 1260 (R.I. 1999) (quoting § 46-23-6(2)). Given the CRMC's limited legislative power, it must confine its conduct to its expressly defined channels through which the legislature has authorized it to act.
In order to act as an agent for the State, the "CRMC has been given authority to develop policies, programs and regulations that pertain to coastal areas." Strafach v. Durfee,635 A.2d 277, 279 (R.I. 1993) (citing § 46-23-6). Under G.L. § 46-23-6(B), the CRMC has authority to
 "[A]pprove, modify, set conditions for, or reject the design locations, construction alteration, and operation of specified activities or land uses when these are related to a water area under the agency's jurisdiction, regardless of their actual location."
Furthermore, any person proposing development within the State's tidal waters (such as a dock)
 "shall be required to demonstrate that is proposal would not (i) conflict with any resources management plan or program; (ii) make any area unsuitable for any uses or activities to which it is allocated by a resources management plan or program; or (iii) significantly damage the environment of the coastal region." Id.
Pursuant to the powers granted to it by the General Assembly, the CMRC has promulgated regulations under the CRMP. See CRMP. Agency regulations which are promulgated pursuant to an express grant of statutory authority, like the CRMP, have the "force of law." Henry v. Earhart, 553 A.2d. 124, 127 n. 1 (R.I. 1989) (quoting Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983)). The CRMP provides in accordance with CRMC's enabling legislation, G.L. 1956 § 36-23-6, that all alterations and activities proposed for tidal waters or areas contiguous to shoreline features shall require CRMC assent. The State's tidal waters and coastal ponds have been researched and assigned to one of six (6) use categories ranging from Type 1 (Conservation Areas) to Type 6 (Industrial Waterfronts and Commercial Navigation Channels).
The CRMP sets forth the prerequisites, standards, and requirements for construction activities within tidal waters or in the coastal zone which must be adhered to by an applicant for *Page 9 
a permit. In the instant matter, the tidal waters fronting Benincasa's property are classified as "[T]ype 2 Low-Intensity Use" by the CRMP. The findings and policies relating to Type 2 waters are set forth in CRMP Section 200.2 which state in relevant part:
 "It is the Council's policy that one or more of the following conditions describe a situation, condition, or proposal that is deemed to have a significant adverse affect on Rhode Island's coastal resources and therefore is grounds for denial or modification of an application from an Assent: . . .
 (d) Water depths adjacent to the site would require dock span lengths in excess of the standards contained in Section 300.4E in order to allow normal and appropriate use of the dock by a vessel."
Additionally, pursuant to CRMP Section 300.4.B.2.c, "[a]ll recreation boating facilities shall be designed and construed to adequately withstand appropriate environmental conditions present at the site and to minimize impacts to existing resources."
In order for an application to be approved, numerous standards must first be met. Section 300.4 of the CRMP, relating to "Recreational Boating Facilities," sets forth standards which must be met for proposed marinas, including ramps, and residential docks. These standards related to design criteria and construction standards. See id. If a prospective applicant is unable to meet a standard, or seeks relief, then the individual must satisfy the criteria set forth in Section 120 of the CRMP regarding a variance. The CRMP also includes a number of prohibitions. Relief from these prohibitions can only be obtained if an applicant is able to show the grounds for a "Special Exception," which requires that the activity serve a "compelling public purpose." See
CRMP § 120.
In the instant matter, residential docks are permissible in Type 2 waters so long as the application meets the other standards set forth in the CRMP. Benincasa's application does not implicate any of the prohibitions of the CRMP. However, Benincasa did request a variance from *Page 10 
the standards in Section 300.4.E.3 (1), which limit residential boating facilities to only 50 feet seaward of MLW.
Following the receipt of a completed application, CRMC staff biologists and engineers review the application in accordance with the CRMP. The staff's review may include a site visit and a series of correspondence with the applicant. Based on this review, the CRMC will then prepare a report and make a recommendation to the CRMC pursuant to § 46-23-15 (permitting the CRMC Council to employ its own expert staff). If the application is later amended or modified, the staff will then prepare an addendum to their initial report, detailing whether the recommendation has been changed. The CRMC staff is present for the public hearings before the CRMC and are available to be questioned by both the CRMC members and any interested parties. At the conclusion of the public hearing, the CRMC votes to approve, modify, or deny the application as set forth in its enabling statute. A written decision with "Findings of Fact" and "Conclusions of Law" is then issued. It is from this final CRMC Decision that the aggrieved parties in the instant matter are appealing.
 IV Review of the Council's Decision
Appellants state various grounds upon which the CRMC Decision should be reversed or remanded. Both Benincasa and Objectors contend that CRMC's reduction in the requested variance was "random" and not based upon any evidence in the record. Also, Benincasa argues that the proposed dock satisfies the Goals and Policies in Parts Two and Three of the CRMP and would not cause any significant adverse environmental impact or use conflicts. Furthermore, Benincasa contends that compliance with Section 300.4 of the CRMP would create an undue hardship. Additionally, Benincasa contends that Objectors' appeal should be dismissed because *Page 11 
they do not have standing. Finally, Objectors contend that the CRMC improperly granted Benincasa's application and committed a number of alleged "errors of law" when reaching its decision.
 A Competent Evidence
Both Benincasa and Objectors argue that the Council's factual findings are conclusory in nature and insufficient to support the CRMC's Decision. The CRMC, however, contends that each of the Council's findings of fact are supported by competent evidence in the record.
Pursuant to G.L. § 42-35-12, the Administrative Procedures Act requires that "[f]indings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." SeeSakonnet v. Rogers, Inc., 536 A.2d 893, 896-97 (R.I. 1988);East Greenwich Yacht Club v. Coastal Resources ManagementCouncil 118 R.I. 559, 569, 376 A.2d 682, 687 (1977). These findings of fact set forth in an administrative agency's decision must be supported by legally competent evidence in the record.See Johnston Ambulatory Surgical Assocs.,Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quotingBarrington Sch. Comm. v. R.I. State Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992)). Even though reasonable minds may have reached contrary results and even if the Court views the evidence differently than the CRMC, so long as the CRMC's findings were based on the competent evidence before it, the Decision of the Council should be affirmed. See Berberian v. Dept. ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). *Page 12 
 1 Request for Variance
In the instant matter, the CRMC Decision contained nineteen Findings of Fact and three Conclusions of Law. As set forthsupra, if an applicant cannot meet a required standard in the CRMP, he or she can request a variance pursuant to CRMP Section 120. In relevant part, CRMP Section 120 states:
 "A. Applicants desiring a variance from a standard shall make such request in writing and address the six criteria listed below in writing. The application shall then be granted an Assent only if the Council finds that the following six criteria are met:
 (1) The proposed alteration conforms with applicable goals and policies in Parts Two and Three of the Coastal Resources Management Program.
 (2) The proposed alteration will not result in significant adverse environmental impacts or use conflicts, including but not limited to, taking into account cumulative impacts.
 (3) Due to conditions at the site in question, the applicable standard cannot be met.
 (4) The modification requested by the applicant is the minimum variance to the applicable standard necessary to allow a reasonable alteration or use of the site.
 (5) The requested variance to the applicable standard is not due to any prior action of the applicant or the applicant's predecessors in title. With respect to subdivisions the Council will consider the facts as set forth in (B) below in determining the prior action of the applicant.
 (6) Due to the conditions of the site in question, the standard will cause the applicant an undue hardship. In order to receive relief from an undue hardship an applicant must demonstrate inter alia the nature of the hardship and that the hardship is shown to be unique or particular to the site. Mere economic diminution, economic advantage, or inconvenience does not constitute a showing of undue hardship that will support the granting of a variance."
Section 120(c) also provides that "[r]elief from a standard does not remove the applicant's responsibility to comply with all other program requirements." Id. *Page 13 
Benincasa presents several arguments, he has met all the Section 120 variance criteria; the CRMC's Decision does not conform to the applicable goals and policies in Part Two and Three of the CRMP; furthermore, the CRMC's reduction of the requested variance was random and not based on any evidence in the record. The CRMP policies for Type 2 waters permit docks, provided it can be demonstrated, that "there will be no significant adverse impact to coastal resources." CRMP § 200.2(c)(3). When one or more of the conditions set forth in CRMP § 200.2(c)3 is present, it is "deemed to have a significant adverse affect on Rhode Island's coastal resources and is therefore grounds for denial or modification of an application for Assent." Furthermore, CRMP § 300.4.E.3.1 states that "[r]esidential boating facilities shall not exceed beyond that point which is . . . (2) fifty (50) feet seaward of MLW." CRMP § 300.4.B.2.c requires that all recreational boating facilities be "designed and constructed to adequately withstand appropriate environmental conditions present at the site and to minimize impacts to existing resources." Sections 300.4.A.12 and 300.4.E.3(v) of the CRMP also provide that the CRMC council must take into account the fetch, wave conditions, wind conditions, and lateral access for all new residential docks.
Deference is due to an agency's interpretation of its own rules or regulations. Gonzales v. Oregon, 546 U.S. 243, 244 (2006);Citizens Savings Bank v. Bell,605 F.Supp. 1033, 1041 (D.R.I. 1985); State v. Cluley,808 A.2d 1098, 1103 (R.I. 2002). Similarly, the Court will defer to an agency's interpretation of an ambiguous statute "`whose administration and enforcement have been entrusted to the agency * * * even when the agency's interpretation is not the only permissible interpretation that could be applied.'" Auto Body Association ofRhode Island, 996 A.2d at 97 (quoting Pawtucket PowerAssociates Limited Partnership v. City of Pawtucket,622 A.2d 452, 456-57 (R.I. 1993)) (redactions in original). In the instant matter, the CRMC has been *Page 14 
granted the authority to interpret the regulations contained within the CRMP, including parts Two and Three. See R.I. Gen. Law Sec. 46-23-6(1). Furthermore, the CRMC also has the authority to modify an application for assent in order to ensure compliance with the CRMP regulations. See CRMP § 200.2(c)3. Reading these regulations in their totality, it is quite clear that the dock proposal by Benincasa, which extended 95.6 feet beyond MLW, did not conform with the applicable goals and policies in Parts Two and Three of the CRMP. Relying on their own experience, Council members expressed concerns regarding the requested variance during the hearing. (R. 111).
It is well settled that boards such as the CRMC are presumed to have knowledge concerning the matters which are related to an effective administration of their statutes and regulations. Where it appears from the record that a decision was reached in reliance upon such knowledge, it is considered adequate to constitute legal evidence sufficient to support such a finding. Monforte v. ZoningBd. of Review, 93 R.I. 447, 448-49 176 A.2d 726, 727-28 (1962). In the instant matter, one of the central issues confronting the CRMC was how far past MLW the dock needed to extend in order to be functional while at the same time conforming with Parts Two and Three of the CRMP. It is clear that the Council's findings of fact regarding the necessary variance are based upon competent evidence in the record. See Environmental Scientific,621 A.2d at 209. Benincasa's engineer testified at the June 10, 2009 hearing that at 50 feet MLW, the end of the dock would have approximately two feet of water. (R. 91.) The engineer stated he was designing the dock to accommodate a small 20-foot boat which he assumed would require a draft of 3.5 feet of water. The CRMC did not find the evidence presented by Benincasa to be credible and indeed disputed whether a 20-foot vessel would draw 3.5 feet of water based on their specialized knowledge which was discussed on the record. See *Page 15 Mendonsa v. Corey, 495 A.2d 257, 260 (R.I. 1985) (holding that deference should be given to agency credibility determinations unless they are totally devoid of competent evidentiary support in the record). The Council recounted evidence that it heard on this issue, and CRMC member Sullivan doubted the credibility of Benincasa's witness, noting instead only 18-20 inches of water was necessary. (R. 97-99). After a review of the CRMC deliberation at the June 10, 2009 hearing, this Court finds there is clearly a basis for the Council's finding of fact. Sullivan noted on the record that
 "I think the request to get out to four feet, 3.8' is excessive, and I have a representation that there is a need for much less. We have a definitive standard of an 18-inch minimum, and were the request to be for the proposal to get to a 33 percent beyond the minimum, which would be a two-foot depth, I would feel quite different because that represents I think an appropriate use, a consistency with the expressed need or wishes of use, and would represent to me an acceptable balance between public trust and personal use." (R. 111).
Other CRMC members agreed with this rational. (R. 110-114). At arriving at their decision to extend the dock 55 feet beyond MLW as a functional modification, the CRMC members relied on evidence presented by Engineer Anderson in order to determine what distance beyond MLW would give Benincasa between a two and three foot depth. (R. 113.) Engineer Anderson stated he was utilizing "P5" of the CRMC packet which was part of the engineering plans submitted by Benincasa's engineer in order to reach his conclusion. Id. The calculations used came directly from the exhibits which Benincasa submitted. Indeed, Engineer Anderson confirmed from the engineered plans that at 55 feet MLW, Benincasa would have water in the "two-and a half feet range." Id. While Benincasa contends that this evidence was not invited or allowed, Director Sullivan had been pursuing this line of logic during the questioning of Benincasa's engineer. Director Sullivan stated in pertinent part `[c]ould you tell me what *Page 16 
lengths of dock might you need on this site to provide an 18 to 24-inch depth at mean low on this site'" (R. at 98.) Counsel for Benincasa could have objected to this line of inquiry but failed to do so. A party who fails to assert his/her objections or theories of the case is deemed to have waived those rights on appeal.See Fiske v. MacGregor, Division of Brunswick,464 A.2d 719, 726 (R.I. 1987).
Although ample evidence was presented on both sides by competent individuals who had both engineering and maritime experience regarding the issue of the appropriate variance this Court may not substitute its judgment for that of the CRMC as to the weight of the evidence on questions of fact. See G.L. § 42-35-15(g). The CRMC found its own experts and experience to be more credible than Benincasa's evidence on these issues, and this Court must given deference to that determination. See EnvironmentalScientific, 621 A.2d at 209.
 2 The CRMC's Modification To Require Higher Construction Standards
Benincasa also contends that the CRMC erred in requiring the dock be built to more stringent design requirements set forth in CRMP Section 300.4.E.2.1 for areas of excessive fetch. The CRMC made several findings of fact with respect to the issue of excessive fetch. The CRMC based this finding on the testimony of CRMC engineer Anderson, who noted the site is "very close to being considered an excessive fetch site." (R. 97). Engineer Anderson stated that in order for the structure to withstand hazardous force at the site "requires additional engineering analysis and calculations and a somewhat beefier structure. Id. The CRMC found that the presented evidence demonstrated that the site was exposed to wind, wave, and fetch conditions. CRMC Member Dawson pointed out that based on his personal knowledge "seas can tend to get pretty tough out there. I just think that if a storm came through, this dock is going to be history. *Page 17 
(R. 110). CRMP Section 3000.4.B.2(c) notes that facilities must be designed and constructed to adequately withstand appropriate environmental conditions present at the site, which include items such as fetch conditions. The Administrative Record clearly reflects that CRMC Members reached their conclusions based on both personal knowledge and expert witness testimony. (R. 4.) The CRMP clearly requires site specific design to address specific environmental conditions. Having based its Decision on both expert testimony and personal knowledge, the CRMC did not exceed its authority by imposing on Benincasa the requirement to construct his facility to extreme fetch requirements. See Champlin's Realty v.Tikoian, 989 A.2d at 441-42; see also Milardo,434 A.2d at 272.
This Court finds that the Council's findings of fact on the issue of construction standards for Benincasa's dock are based on competent evidence in the record and support the CRMC's decision.See id. It is clear that the Council weighed the evidence presented by both parties and concluded that the knowledge of its members, and the evidence presented by Engineer Anderson was more credible. See id. Giving deference to the CRMC's determination as to the credibility of the witnesses and the weight of the evidence pursuant to G.L. § 42-35-15(g), this Court finds that the Council's findings of fact on the issue of construction standards for Benincasa's dock were based on competent evidence in the record and were not clearly erroneous. See id.
 B Objectors' Standing
In order for a party to have standing, he or she must demonstrate an actual "injury-in-fact." East Greenwich Yacht Club,376 A.2d at 684. An "injury-in-fact" is one that involves a "legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not "conjectural or "hypothetical."Lujan v. Defendanrs of Wildlife, 504 U.S. 555, 560 (1992). *Page 18 
Simply alleging an adverse impact to one's property interests in not enough to establish an injury in fact. See Meyer v. City ofNewport, 844 A.2d 148, 151 (R.I. 2004) (holding that abutting landowners did not suffer injury in fact and thus did not have standing to pursue action seeking declaration that a consent judgment between city and developer regarding the use of a wharf was invalid). The injury in fact must be particular to the plaintiff and a personalized injury distinct from that of the community as a whole. See id. The Rhode Island Supreme Court has ruled that alleged injuries to interests that are vested equally in the community, such as access to the waterfront, are not sufficient alone to give rise to standing. Id.
In the instant matter, the allegations in the Objectors' Complaint are both generalized and speculative. The Objectors have failed to allege any specific type of injury that individuals would suffer, and furthermore have failed to explain with any detail what specific impact would be harmful. This Court cannot be expected to speculate with what injury, if any, the Objectors in the instant matter would be threatened. The Objectors in the instant matter only alleged that they were "aggrieved" by the CRMC Decision. (Pl.'s Compl. 1.) The Complaint is devoid of specific allegations regarding the type of alleged injuries that would result from the proposed dock being built. Furthermore, there is no evidence to support that Objectors would suffer an injury-in-fact that is separate from that of the community at large. See Meyer, 844 A.2d at 151. Only one of the Objectors, Aidinoff, owns the land directly adjacent to the Property, and it has been noted by the Rhode Island Supreme Court that abutter status alone cannot give rise to standing.See id. at 150. As such, this Court finds that Objectors lack the requisite standing to appeal the CRMC Decision. *Page 19 
 C Issues Raised by Objectors
Assuming arguendo that the Objectors did have standing to appeal the CRMC Decision, their appeal would still fail on its merits. Objectors raise a number of alleged "errors of law" and substantive disagreements with the CRMC's written Decision. This Court will briefly address each allegation. The Objectors contend that CRMC Chairman Tiokian "erroneously" counseled the CRMC regarding the legal standard for a grant of a variance. However, as set forth supra, relief from a policy or standard implemented by the CRMC is promulgated in Section 120 of the CRMP. Relief from a prohibition implemented by the CRMC, however, is promulgated under Section 130 of the CRMP dealing with special exception. Objectors refer to CRMP Section 200.2(3)d and argues that if the water depth would require a dock span in excess of the standards contained in Section 300.4.E, it is a prohibited activity. However, Chairman Tikoian correctly noted that the provisions of Section 200.2.3 of the CRMP are policies and not strict prohibitions. If an activity is prohibited, it is specifically listed as a "Prohibition" within the relevant section of the CRMP. However, relief from a CRMC policy or standard may be allowed by way of a variance. Additionally, CRMP Section 200.2.C.3 states failure to comply with its provisions is grounds for "denial or modification" of an application for assent. As set forthsupra, the CRMC determined the standards set forth in 300.4.E could not be met by Benincasa's proposal, but rather than approve the proposed dock with a 45.6 foot variance, the CRMC modified the proposal to allow the minimum variance to obtain the necessary water depth for a usable dock.
The Objectors also argue that the CRMC Decision was erroneous because the CRMC "unilaterally" amended the application to approve a 5-foot variance to the 50 feet beyond MLW standard. Objectors maintain that the CRMC was required to either approve or deny the *Page 20 
application as submitted. However, the CRMC has the explicit statutory authority to "approve, modify, set conditions for, or reject any such proposal before it."See § 46-23-6(2)ii(B). Furthermore, the Objectors are mistaken in suggesting that the CRMC's actions may constitute exparte proceedings. Both Champlin's Realty, 989 A.2d at 1127 and Arnold v. Lebel, 941 A.2d 813 (R.I. 2007) hold that no litigious facts should reach the decision-maker off the record during an administrative hearing. However, the instant matter was conducted entirely on the record, with the opportunity for the parties involved to contest the evidence on the record. As such, Objectors' argument is misplaced. The Objectors, like Benincasa, had a full opportunity to contest the evidence presented on the record.See Champlin's Realty, 989 A.2d at 1127;Arnold, 941 A.2d at 813.
Objectors maintain that the CRMC Decision is also erroneous because the variance approved by CRMC was not the minimum necessary to allow a reasonable use of the site. See
CRMP § 120(A)4. This Court has discussed supra the permissible evidence that the CRMC relied upon for concluding that the 5-foot variance was the minimum necessary to allow a reasonable use of the dock. The discussion of the CRMC members during the June 10, 2009 public hearing demonstrates that the members analyzed the issue of dock length when making their determination. (R. 110-114.)
Objectors further argue that the CRMC Decision is erroneous because the project would detrimentally impact public trust use of the shore. Objectors focus on the lateral access along the shore and the impacts on people navigating the adjacent waters. However, the CRMC addressed those issues specifically in its Decision. CRMC Section 300.4.E.(3)(v) requires that on any dock proposal lateral access "shall be provided under, around or over" as appropriate for the site condition. The CRMC modified the application to require the dock be elevated to allow 6 feet of *Page 21 
passage underneath at high tide. In its Decision, the CRMC made a factual determination there would be no negative impact to navigation in the area because the uncontroverted evidence noted there would be at least a 900-foot separation from the dock to the channel, and there would be ample room for kayaks and small boats to operate. Furthermore, this finding was confirmed by the CRMC engineer in his report as well as in the testimony of Benincasa's engineer. (R. 48-49; 92-93). The Objectors contend that CRMC approval would also degrade scenic values. In their Decision, the CRMC noted that the modification of the application would minimize any aesthetic impact. (R. 4). As such, this Court will defer to those findings of fact supported on the record. SeeMilardo, 434 A.2d at 272.
Additionally, Objectors assert that the CRMC Decision violates CRMP Section 300.4.B.2(b) as it relates to the "capacity of the coastal areas to support boating." The Objectors note that the site in question has a high fetch and is exposed to the elements. While CRMC members did recognize the vulnerability of a potential dock to severe environmental conditions, the CRMC also recognized that the waters in question are classified as Type 2, and that docks are permitted in Type 2 waters. As a mitigating measure, the CRMC imposed the condition that the structure be constructed in accordance with the structural requirements imposed on high fetch areas. (R. 5-6). This Court finds that there is reliable, probative, and substantial evidence on the record to support the CRMC's modification of the Benincasa's variance requests. This Court is tasked with applying the `some' or `any' evidence test which is not satisfied by any evidence, but only by that which we determine from our review of the record has probative force, due to its competency and legality. Salve Regina College v. Zoning Board of Review ofthe City of Newport, 594 A.2d 878 (R.I. 1991) (quotingThomas Methodist Church v. Zoning Board of Review ofPawtucket, 99 R.I. 675, 681, 210 A.2d 138, 142 (1962)). In the current case, the *Page 22 
CRMC considered the evidence of its engineer, Benincasa's engineers, and their own experience, and thus had extensive knowledge of the build site in question. As such, the CRMC's decision demonstrates that the Council considered competent evidence in the record to support its findings of fact.
 D Compliance with CRMC Procedure
Objectors argue that CRMC's consideration of the modified Benincasa application violates the doctrine of administrative finality and notice requirements. However, these arguments were not raised before the CRMC, and as such have been waived on appeal. It is a fundamental rule of appellate practice in this state, that matters not brought to the attention of the fact finder, may not be raised for the first time in court on appeal. SeeCok v. Cok, 479 A.2d 1184, 1188 (R.I. 1984). Hence, a party who fails to assert his/her objections or theories of the case is deemed to have waived those rights on appeal. See Fisk v.MacGregor Division of Brunswick, 464 A.2d 719, 726 (R.I. 1983). This basic appellate rule applies with equal force in the context of an appeal of an administrative decision. SeeStrafach, 635 A.2d at 283-84. The Objectors did not raise these issues before the CRMC. Objectors' oversight cannot now form the grounds for the reversal of a final agency decision.See id. Consequently, Objectors have waived these issues by failing to bring such issues to the CRMC Board's attention.
 1 Rule of Administrative Finality
The doctrine of administrative finality requires that when an administrative agency reviews an application and denies it, the same subsequent application may not be granted absent a showing of a material and substantial change in the circumstances in the time intervening *Page 23 
between the two applications. Johnson Ambulatory SurgicalAssociates, Ltd. v. Nolan, 755 A.2d 799, 811 (R.I. 2000). This rule places the burden on the applicant to identify the substantial changes since the prior application. See id
What constitutes a material change depends on the context of a particular administrative scheme and the relief sought by the applicant and will be determined with reference to the pertinent statutes, regulations, and case law that govern a specific agency.Id
In the instant matter, Benincasa made significant changes in the application to address the concerns utilized by the CRMC as grounds for the original denial. During the course of the January 13, 2009 CRMC herein, CRMC member Gray expressed serious concerns that the floats at the end of the dock would create an unsafe condition. (R. 78). Following this hearing, the application was subsequently denied on a 6-2 vote. Id Benincasa then approached CRMC staff and agreed to make the necessary changes suggested by CRMC member Gray. The CRMC members then agreed to reconsider the matter because Benincasa had agreed to make the changes that formed the basis of the previous CRMC denial. Because of these factors, it is clear that the CRMC did not run afoul of the doctrine of administrative finality. Once denied with the original application, Benincasa altered his application to address the CRMC members' concerns. This change in Benincasa's dock design clearly constitutes a material change that allowed the CRMC to properly reconsider the application. See In re Denisewich,643 A.2d 1194, 1197 (R.I. 1994). *Page 24 
 2 Standing
Objectors contend that they have been prejudiced by a lack of notice. However, at the June 10, 2009 CRMC hearing, counsel for objectors stated he represented "Rose Aidinoff, Ken and Cheryl Chernack, John and Laura Humphrey, Mike Fahey and Joe Jacque." (R. 85.) The CRMC Chairman stated that the members had read the objections and counsel would be allowed to discuss and argue the objections. Objectors maintain, however, that CRMC should have treated Benincasa's application as a "new" application requiring a 30-day notice period, new staff reports, and a new application number.
There is nothing in the CRMC Management Procedures or the APA that supports this contention. All parties in this matter had actual notice of the hearing and were given ample opportunity to present any evidence or arguments they chose. The CRMC staff reports were available well before the January 13, 2009 hearing, and the essential conclusions remained unchanged when the June hearing commenced. As such, the CRMC hearing process clearly provided adequate and actual notice to interested parties and was conducted in a fair manner pursuant to Sections 5.1, 5.2, and 5.3 of the "RICMRC Management Procedures." All parties were given an opportunity to present their case and challenge the evidence presented in accordance with the aforementioned regulations. *Page 25 
 IV Conclusion
After a review of the entire record, this Court finds that the CRMC's decision to grant and modify Benincasa's application to construct a new dock is not affected by error of law and does not exceed the CRMC's statutory authority. The CMRC's decision is not clearly erroneous in view of the reliable, probative, and substantial evidence of record. Additionally, this Court finds that the CMRC's decision is not arbitrary or capricious or characterized by abuse of discretion, or an unwarranted exercise of the CMRC's discretion. Substantial rights of the Appellants have not been prejudiced. For the foregoing reasons, the decision of the CMRC, dated February 2, 2010, which granted and modified James Benincasa's application to build a new residential boating facility, is affirmed. Counsel shall confer and submit forthwith for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] A fetch is "an area where ocean waves are being generated by the wind." Webster Unabridged Dictionary of the EnglishLanguage, 2nd ed., 2001. *Page 1